OPINION OF THE COURT
Israel Margolis, J.
Claimants in this action seek damages alleging that claimant Jane Doe acquired the virus which causes AIDS as a result of the negligence of defendant’s correction officers. The correction officers, Ronald Potempa and Timothy O’Connor, were charged with guarding inmate John Smith at Faxton Hospital (Faxton), where claimant Jane Doe was employed as *288 a registered nurse.[1] On August 21, 1988, Mrs. Doe, then 38 years of age, was stuck in the hand by a needle which had become dislodged from an IV apparatus contaminated with Mr. Smith’s blood. Mr. Smith had AIDS. It is undisputed that he became agitated some time after 6:00 a.m. on August 21, while in defendant’s custody at the hospital. Claimants assert that the correction officers were obliged to intervene to help restrain the patient. Claimants assert that the officers failed to fulfill this obligation. They allege that the officers’ misconduct resulted in Mrs. Doe’s injury, will cause her suffering, and will result in accelerating her death. The Does married on August 9, 1969, and they have three children. Mr. Doe has asserted a derivative claim and a claim in his own right. Though he was not present at the time of the needle stick, Mr. Doe asserts that the defendant’s lack of due care has, inter alla, exposed him to a risk of HIV contamination.
The court finds that Mr. Smith did become agitated as alleged and that the medical staff continued to coax and guide the patient back to bed though he continued to object, insisting that they did not understand. The court finds that Nurses Helen Norine and Jane Doe both, on several occasions, asked the guards again for help, without avail. The medical staff had finally gotten John Smith into bed when he saw they had procured leather restraints. He then became truly combative, striking Helen once, kicking at Orderly Jack Pritchard, and hitting Jane Doe several times. Jane Doe testified that the struggle to apply the leather restraints took 10 minutes before the needle stick and that it was during this struggle that the needle came out of the Hep-Lock port. In any event, Helen Norine was the one in this remaining group, while holding down the inmate’s leg, that discovered the loose needle. Ms. Norine testified that she spotted the needle lying on the bed, *289 dripping blood. The court finds that she had just gotten the tubing to the needle free from the tape and was holding the needle in her hand when the patient, whose left leg was now free from the nurse’s grasp, jerked. Helen Norine’s arm was bumped by the patient and it then contacted Jane Doe’s arm. The contaminated needle plunged into Jane Doe’s hand. The court finds that no correction officer was restraining the inmate at this time.
Preliminarily, we note the defendant does not contest that correction officers guarding inmates at outside hospitals are under an obligation to intervene where innocent medical personnel were likely to be injured by misconduct by their charge. The New York State Department of Correctional Services entered into a written contractual arrangement which makes express the obligation of its correction officers “to provide adequate and proper security and supervision of its patients while they are at [Faxton].” The express terms of the agreement, along with the appearance and the previous conduct of the uniformed correction officers at the hospital, were intended to and tended to be representations that the correction officers, who had custody of an inmate at the hospital, were there to intervene when needed. Moreover, New York State Department of Correctional Services had adopted a detailed directive which provides instruction to its employees as to how they were to act and helps define the employee’s responsibilities on outside hospital duty. The directive provides, “Whenever a hospital emergency occurs, the correction officer shall follow the instructions of authorized hospital staff.” It cannot be disputed that the incidents which the court finds occurred on August 21 were, within the meaning of this directive, "a hospital emergency”. Moreover, the court finds that the correction officers present failed to follow the reasonable instructions of the hospital staff, numerous times.
Defendant urged that Helen Norine was negligent in attempting to reinsert the contaminated needle back into the Hep-Lock port. Dr. Craig Hutchinson testified, inter alla, that conduct deviated from acceptable standards for two important reasons. First, it "presented a tremendous danger of a medical stick,” and second, the needle was exposed to bacteria and fungi on the bed surface and whatever objects it had contacted and presented a serious risk of contamination if offered to exposure into the patient’s bloodstream. Defendant urges that such conduct was an intervening superseding cause and that *290 it was that conduct which ultimately resulted in Mrs. Doe being stuck with the needle. Dr. Hutchinson, a physician licensed to practice medicine in the State of Michigan and employed in the Bureau of Health Care Services in the Michigan Department of Corrections, testified that the other two options presented "were to back off, let things settle down or, to make some attempt to just cut those IV lines and get the thing out of the field”.
The law is clear, however, that where, as here, a person is faced by an emergency, one still must act only as a reasonable person would under the emergent circumstances (see, e.g., Rivera v New York City Tr. Auth., 77 NY2d 322, 327). It is very simple, in a courtroom, far removed from the crisis presented, to suggest other options available to one presented in a life-threatening circumstance which these nurses had no occasion to cause. This ignores the reality of the situation, however. The focus of attention when these nurses entered this room was to get this patient back on oxygen to save his life. When we consider the exposed needle alone, it is rather simple now to suggest that all the health care providers should have effectively fled the room and left the patient and the correction officers guarding him to their fate. Perhaps self-preservation is the most basic instinct. For these nurses, however, that was not what they were there for. They were doing the best they knew how to preserve this patient’s life, a man apparently delirious with a lack of oxygen, suffering pulmonary compromise, and in danger of cardiac arrest. These nurses were presented with an extraordinary crisis because of the failure of the correction officers to swiftly intervene. The emergency itself was caused by the defendant’s employees in their failure to do their duty. As to Ms. Norine’s conduct, under the circumstances, it appears to us that it is eminently reasonable, under the crisis at hand, to first attempt to effectively cap the needle, put it where it belongs, and save this patient’s life breath before considering her chances of exposure from a dirty needle. We have had a careful opportunity to consider the alternatives to her conduct. We all wish there were other readily available options to her. But we do not find under the emergency circumstances presented either that her conduct was negligent or that it proximately caused Mrs. Doe’s injury.[2] We must keep in mind this was not just *291 one emergency. This was several emergencies. Her patient was without adequate oxygen and flailing about, risking death from pulmonary compromise, risking seizure and risking a loss of consciousness. Another staff nurse was suffering pulmonary compromise herself because of the inmate’s struggles, her exertion and her asthma. Finally, and suddenly, Helen Norine was presented with the life-threatening danger posed to herself and her whole staff by an apparently HIV-contaminoted needle being flailed in the room. Faced with these emergencies, Helen Norine acted as a reasonably prudent person would and the court finds that she was not negligent. Even if negligent, her conduct is not found to be a superseding cause.
On a related issue, we note that the defendant did not in any way assert that the health care providers were not privileged to intervene and attempt to control and treat Mr. Smith on August 21. The court is well aware of and has considered herein the case Rivers v Katz (67 NY2d 485), its predecessors and its progeny, which firmly preserve the right of every individual to determine the course of his medical treatment. The Court of Appeals has stated: "In this State, however, there is no statute which prohibits a patient from declining necessary medical treatment or a doctor from honoring the patient’s decision. To the extent that existing statutory and decisional law manifests the State’s interest on this subject, they consistently support the right of the competent adult to make his own decision by imposing civil liability on those who perform medical treatment without consent, although the treatment may be beneficial or even necessary to preserve the patient’s life [citations omitted]” (Matter of Storar, 52 NY2d 363, 377, cert denied 454 US 858). The most obvious example where this maxim yields, however, is where there is an emergency situation as when there is imminent danger to the patient or others in the immediate vicinity such that a facially nonconsensual touching must be tolerated under certain circumstances (cf, Rivers v Katz, 67 NY2d 485, 496, supra). In the present case, the patient, both before and after the underlying incident, consented to the medical treatment offered, at times in writing where the treatments were *292 especially invasive. We find, in light of these continuing consents and the emergent circumstances presented, whereby the patient was a danger to himself in inviting cardio-pulmonary failure by removing his oxygen mask and a danger to others through his resulting combativeness, that the health care providers’ conduct in restraining and treating the patient throughout this episode was privileged. The refusal of the correction officers to act at their direction was not privileged and was negligent.
As set forth in section 8 of the Court of Claims Act, the State of New York has waived its sovereign immunity and assumed liability for its conduct in accordance with the same substantive rules of law applicable to individuals and corporations (see, Florence v Goldberg, 44 NY2d 189, 194-195). The State, however, continues to retain its immunity in several areas (see, e.g., Arteaga v State of New York, 72 NY2d 212 [employee discretionary disciplinary conduct of a quasi-judicial nature in accordance with statute and regulation]; Stukuls v State of New York, 42 NY2d 272 [defamation by certain governmental executives in pursuit of their official obligations]; Weiss v Fote, 7 NY2d 579, 587 ["exercise of expert judgment in the course of government planning for the public safety”]; see, Mahoney v Temporary Commn. of Investigation, 165 AD2d 233, 237-238). Moreover, public entities remain immune from negligence claims arising out of the performance of their governmental functions, including police protection, unless the injured person establishes a special relationship with the entity, one which would create a special duty to protect that individual, and the individual relied upon the performance of that duty (see, Miller v State of New York, 62 NY2d 506, 510, citing De Long v County of Erie, 60 NY2d 296, 304, among others). The Court of Appeals has noted: "A governmental entity’s conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection. Consequently, any issue relating to the safety or security *293 of an individual claimant must be carefully scrutinized to determine the point along the continuum that the State’s alleged negligent action falls into, either a proprietary or governmental category” (Miller v State of New York, 62 NY2d 506, 511-512, supra). Defendant asserted in its answer, as a fourth affirmative defense, "Upon information and belief, the defendant may be afforded immunity as to the allegations contained in the claim”. But this immunity claim was not developed at trial and not asserted at all in the defendant’s posttrial brief. We have little guidance from the parties as to where defendant’s obligations in issue here lie upon the defendant’s continuum of responsibility.
At first blush, it would appear that there can be little better example of a purely governmental operation of the police power than the confinement of those who have committed serious violations of the State’s penal laws. If this were operation of the police power merely, claimants would need to resort to traditional principles establishing that a special duty was owed them (see, Vitale v City of New York, 60 NY2d 861 [where the Court of Appeals reversed a judgment in favor of a teacher who was assaulted by a student allegedly as a result of the city’s failure to implement a detailed security plan]). However, there lies a firmly ensconced exception for treatment of those in custody of the State’s institutions. It is irrefutable that the obligation to keep some prisoners imprisoned is an obligation owed by the Department of Correctional Services to the public at large. There is an inherently foreseeable injury which would inevitably occur were the State to fail to execute its reasonable obligation to restrain some of its charges. Because of this, there is a well-recognized principle with respect to those cared for in the State’s institutions that, where there exists a reasonably foreseeable risk of injury for failure to provide reasonable precautions, the defendant may be held liable for injuries which proximately result from that failure without existence of a special relationship between the person injured and the defendant. The Court of Appeals stated in Dunn v State of New York (29 NY2d 313, 317): "There is no question but that the State bears the responsibility for the protection of others in its operation of schools, hospitals and other institutions (see, e.g., Flaherty v. State of New York, 296 N. Y. 342, 346). This responsibility is not, however, unlimited, but rather is circumscribed by traditional concepts of duty (Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40; Williams v. State of New York, 308 N. Y. 548). In other words, *294 as stated in Palsgraf v. Long Is. R. R. Co. (248 N. Y. 339, 344): 'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension’. This test, 'has, in principle, been consistently applied by the courts in determining whether to impose liability upon the State where injury befalls the patient who elopes from a public institution (cf., Calabria v. State, [289 N. Y. 613] * * *) or a third person who is assaulted by an escaped inmate of a mental hospital (Weihs v. State of New York, 267 App. Div. 233; Jones v. State of New York, 267 App. Div. 254), or where property is damaged by such an inmate. (Benson v. State, 52 N.Y.S.2d 239.)’ (Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40, 45, supra). ”
The State, of course, is not an insurer. The State did not assume an obligation to protect those in contact with this inmate from all injury, regardless of its foreseeability or the limitations upon defendant’s resources in securing against such injuries. But here, we find that there was an obligation on the part of the defendant to exercise reasonable care in providing security to those who would have to come in contact with this inmate while the inmate was in the defendant’s custody and that the defendant breached that obligation. The operating agreement and all the expert testimony on corrections at trial indicated that there was an obligation to provide for reasonable security. The court finds that the obligation on the part of the correction officers present to act upon the reasonable request of medical personnel under the circumstances present was a custom and standard in the industry. The obligation to participate in or make reasonable efforts to participate in the restraint of this inmate was one owed to the medical staff and to the general public within the confines of the hospital, while the inmate was there.
If the proper analysis of this matter is as a special duty case, there is no difficulty in finding that Mrs. Doe was owed that special duty. The Court of Appeals in Cuffy v City of New York (69 NY2d 255, 260) stated that, "The elements of this 'special relationship’ are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality’s agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) that party’s justifiable reliance on the municipality’s affirmative undertaking *295 [citations omitted].” Here defendant and its employees expressly undertook, in writing and by their conduct, to provide security while the defendant’s charge was treated at Mrs. Doe’s place of employment. The nurses were entitled to rely upon the defendant’s affirmative representations set forth in the defendant’s agreement with the hospital. The nurses were entitled to rely upon the correction officers’ uniformed presence, indicating that they were there to assist if their charge became unruly. The health care providers established that the defendant’s correction officers had had a previous past practice of assisting when asked. These offers of assistance were representations which the defendant expected the Faxton employees to rely upon. The Faxton medical staff did rely upon the representations and did so justifiably. They did so in this instance, and Mrs. Doe herself begged the correction officers to assist. The refusal of the defendant’s staff to intervene timely, though they had represented they would, resulted in the inmate’s extreme agitation, the staff’s exhaustion, and ultimately in Mrs. Doe having to intervene herself. The breach of this special relationship resulted in Mrs. Doe’s injury. She relied upon the defendant’s representations to her detriment.
The defendant’s failure to provide reasonable security under the circumstances breached an obligation to the general public as well as to the medical staff in particular. Moreover, as to the medical staff, defendant had assumed a special relationship in consideration for the hospital’s agreement to let the defendant house its charges there. The defendant’s failure to provide reasonable security simultaneously breached an obligation owed to all the people of the State as well as directly to Mrs. Doe.
This breach resulted in injuries to Mrs. Doe personally and to Mr. Doe derivatively, because of the marital relationship. We find, however, that traditional, applicable concepts of tort do not permit the court to award Mr. Doe damages for any injury other than that arising from his derivative losses. In the claim, however, Mr. Doe attempts to state a cause of action in his own right, urging he is directly subject to a risk of HIV infection and suffers emotional harm from that risk, because of defendant’s negligence.
If the proper way to analyze this matter is dependent upon a special relationship that developed between the Department of Correctional Services and the Faxton staff while treating the defendant’s charges, the matter concerning Mr. Doe’s *296 alleged cause of action asserted in his own right is easily resolved against him. The defendant and its employees made no representation to Mr. Doe, who was nowhere near the hospital at the time Mr. Smith became unruly. Mr. Doe did not receive any representation from the defendant, nor did he rely upon any representation of the defendant or its staff. There was no contact of the type discussed in Cuffy v City of New York (supra) between Mr. Doe and the defendant. Moreover, we find that Mr. Doe was not intended to be protected by the operating agreement between Faxton and the Department of Correctional Services and was not. The parties to the written agreement did not intend to provide protection to Mr. Doe by the representations of the defendant that security would be provided in relation to an inmate’s hospitalization at Faxton. The defendant breached no special duty owed to Mr. Doe.
If Mr. Doe seeks to assert his cause of action based upon the general obligation owed by the defendant to secure its prisoners in custody of its institutions, Mr. Doe’s emotional injury does not proximately result from the breach of that duty toward him.[3] Mr. Doe was not at or near Faxton Hospital when the defendant’s employees failed to secure their charge. He was not in any risk of physical injury at the hospital. Whether a breach of duty has occurred depends upon whether the resulting harm was one which was reasonably foreseen as a consequence of the defendant’s act or omissions (Gordon v City of New York, 70 NY2d 839, 840 [where the court held it could not reasonably be foreseen that a prisoner with suicidal tendencies would have "suddenly scaled the bars of his cell and plunged head first into the toilet bowl”]). Claimant Joseph Doe asserts that the defendant State of New York should have reasonably foreseen that by its failure to restrain a hospitalized inmate that the inmate would contaminate his wife with an infectious disease and that, as a result, he would be damaged by the fear that he may contract that disease. Such a chain of events was not reasonably to be foreseen.
On the day of the accident, Mrs. Doe told her husband what had happened, including the needle stick, at home that day. *297 Because she knew that it was, statistically, not likely that she contracted the virus which causes AIDS from this needle stick, she did not then suggest to her husband that they make any changes in their intimate lives.[4]
[5]They continued their completely spontaneous sexual relationship. We note that the best available medical evidence is that Mr. Doe has not yet contracted the virus which can cause AIDS. Lacking evidence that he has suffered a physical injury, we think it just to say that as to the cause of action in his own right, his damages are the fear that he will contract HIV through his wife, who is a carrier. If Mr. Doe will ever suffer a physical injury from Mrs. Doe’s contamination, it will be the result of some contact between Mrs. Doe and Mr. Doe, not between the defendant and Mr. Doe or Mr. Smith and Mr. Doe.
As Mr. Doe was not present and did not suffer direct physical injury on August 21, 1988, this claimant asserts a cause of action in his own right for emotional injuries which he suffers as a result of witnessing the injury and ultimate demise of his wife. In order to recover for such a psychic injury, which, by the way, we find real and substantial,® present law dictates that the claimant must contemporaneously witness the injury or death of an immediate family member and fear for his own safety as a result of being in the zone of danger created by the defendant’s negligence, which creates a threat of bodily harm to both the victim of the physical injury and the eyewitness (Bovsun v Sanperi, 61 NY2d 219). Here, of course, Mr. Doe was not physically present when his wife was injured as a result of the defendant’s negligence. Indeed, he was not informed of the incident until his wife told him of it after dinner that same day. He will, of course, suffer emotionally and will most likely be physically present when Mrs. Doe dies as a result of the injury inflicted. However, the injury which was the result of the defendant’s negligence was a needle stick to Mrs. Doe, and we do not find that that needle stick will proximately cause a physical injury to Mr. Doe. If he becomes contaminated with HIV, it would be neither as a direct nor proximate result of that needle stick.
*298 The defendant’s obligation to not let Mr. Smith escape the hospital and injure Mr. Doe at some other location is different from the defendant’s duty owed Mrs. Doe to restrain the inmate while within the hospital and assist should Mrs. Doe so demand. These two obligations are discrete. The obligation owed Mr. Doe was not breached. Though the obligation owed Mrs. Doe was breached, Mr. Doe has not suffered any physical injury thereby and did not suffer any psychic injury while he was within the zone of danger. Indeed, he was never within a "zone of danger” as that phrase is used in Tobin v Grossman (24 NY2d 609) and Bovsun v Sanperi (supra). There was no danger of physical impact as a result of the defendant’s negligence with respect to Mr. Doe, regardless of the fact that there may be physical effects from the defendant’s misconduct in futuro.
The closest we can come to a reported case, with respect to Mr. Doe, is the case Landon v New York Hosp. (101 AD2d 489, affd on opn below 65 NY2d 639). There, plaintiff parents sought recovery in their own right, urging that the defendant hospital failed to timely diagnose their child’s bacterial meningitis. There the court noted that insofar as the complaint asserted a cause of action for the risk of exposure pending diagnosis, they suffered no actual damage during that period and without injury there can be no cause of action in negligence. For the time after diagnosis, the court said there can be no recovery because the duty to the parents was to timely diagnose and to inform. No cause of action arose from a lack of timely notification.
Here, Mr. Doe knew or should have known of his risk for contracting HIV infection when informed by his wife that she had been exposed to a potentially contaminated needle that day. The defendant’s conduct that day did not breach an obligation owed Mr. Doe. That Mr. Doe continues to face the risk of contamination from his wife is not the proximate result of the defendant’s failure to restrain this inmate, though it is quite clearly a result of the defendant’s negligence. It is not for us to decide whether such a result is good policy in all cases. It is for us to attempt to apply the law as it exists.[6]
*299 In that Mrs. Doe had been infected for approximately four years at the time of trial, and in that her T-helper count at that time was last recorded as 340, Dr. Saah testified that she will probably develop AIDS within the next four to five years. In the view of this expert, her course appears to be progressing more rapidly than most. Because of the therapies she has received we would expect her to have to cope with the opportunistic illnesses which define AIDS for 14 months, and then she will expire. We find that Mrs. Doe’s reasonable life expectancy as a result of this infection is through 1997.
As to the expected course of Mrs. Doe’s illness, Dr. Saah explained that Mrs. Doe would be expected to have to deal with the clinical diseases which typify AIDS for 14 months prior to her death. The typical course was described as follows: "Well, the spectrum is quite broad. The typical patient is usually hospitalized three or four times in the course of having active AIDS. The hospitalizations, depending on the severity of the infection, can range anywhere from three days, to two or three weeks with frequent outpatient visits, office visits. The quality of life depends upon the luck of the draw to a certain extent, on the nature of the opportunistic infections. But no matter what happens in terms of the type of opportunistic infection, the patient doesn’t do well. Patients with AIDS and HIV just don’t drop dead. They don’t drop dead. They die one cell at a time. They die weighing 90 pounds. They die looking like they came out of Auschwitz. They die slowly. The last patient I had died two days ago. The last patient I had who died, he weighed 94 pounds when I saw him in clinic last week. They don’t just drop dead. It’s a very slow death.” It must be understood that there is a possibility that Mrs. Doe’s first opportunistic infection may be a fatal one, such that she is spared the repetitive onslaught of additional infections. It is most likely, however, that she will take the more typical course, which is that she will suffer a total of four or five different opportunistic infections. The unfortunate reality is that while medical science has addressed the various oppor *300 tunistic diseases that typify AIDS, the ultimate chances increase that the AIDS patient suffers more than one of the infections at a time. Thus, as science permits patients to live with increasingly poor immunity systems, the patients can expect to suffer an increasing number of opportunistic infections before they die.
As to the claimants’ expert evidence concerning the economic losses the claimants will suffer as a result of the defendant’s negligence, both parties have asserted the majority rule in the United States, that one whose life expectancy is shortened as a result of a defendant’s negligence may recover the difference between the earnings to be garnered during the abbreviated life expectancy and the wages which would have been earned but for the defendant’s negligence. Counsels’ position has some substantial judicial support. This theory of damages was adopted in the case In re Joint E. & S. Dist. Asbestos Litig. (726 F Supp 426, 430-431), where the court noted:
"In Warren’s Negligence in the New York Courts, it is stated unequivocally that New York uses the majority rule of calculating lost earnings capacity based upon pre-injury life expectancy.
" 'For purposes of measuring damages, life expectancy must be based on the plaintiff’s usual life expectancy, undiminished by any shortening of that expectancy resulting from the injury. To hold otherwise would allow the tort-feasor to benefit merely because the injury inflicted was of a serious nature. Moreover, an award based on preinjury life expectancy reflects the injured victim’s actual loss, i.e., the ability to earn during a normal life span.’ 7A Warren’s Negligence in the New York Courts, Personal Injuries, § 7.04[1] (3d ed. Pt. 2 1984) (emphasis supplied) (footnotes omitted).
"New York courts have not analyzed the problem, although they appear to utilize the majority rule, albeit usually in dicta or by implication gleaned from an analysis of the facts. There is a dearth of reported cases — other than those involving infants — where, at the time of trial, it could be predicted that the injury would substantially reduce the victim’s work-life expectancy.”
We find, however, that adoption of the majority rule would ignore the statutory scheme developed by the Legislature in New York in treating death here. In New York, the only damages which may be recovered by reason of death are *301 funeral expenses and the pecuniary injuries to distributees (see, EPTL 5-4.1). If the majority rule were adopted here, where any decedent dies from tort, the estate’s representative could simply assert a survival action for the decedent’s post-death expected wages. Statutory limitations on the recoveries for wrongful death set forth in EPTL 5-4.1 and 11-3.3 could be simply ignored.
We well recognize that New York State may not be in the majority on this issue, but in our view, Mrs. Doe is not entitled to have the wages she would otherwise have earned, but for her untimely death, accelerated and paid to her during her remaining lifetime. In our view, in this State one may recover only for the injuries one is expected to suffer during one’s lifetime. This is well ensconced in New York decisional law in wrongful death cases, where the damages relating to the decedent’s earnings are limited to the pecuniary injuries the distributees suffer. This position is express in New York State’s legislation. For example, EPTL 11-3.3 (a) provides: "Where an injury causes the death of a person the damages recoverable for such injury are limited to those accruing before death and shall not include damages for or by reason of death, except that the reasonable funeral expenses of the decedent, paid by the estate or for the payment of which the estate is responsible, shall be recoverable in such action. The damages recovered become part of the estate of the deceased.” Thus, a cause of action on behalf of a decedent may be maintained for the decedent’s conscious pain and suffering, medical expenses, and loss of wages prior to death, but the common law does not allow a person to recover for death itself (see, Liff v Schildkrout, 49 NY2d 622). Similarly, as the only cause of action which Mr. Doe may maintain here is derivative in nature, his recovery too is limited by the length of time the court finds with reasonable certainty that Mrs. Doe will survive (see, supra). In Liff v Schildkrout (49 NY2d 622, 632, 633, supra), the Court of Appeals wrote: "Nor can it be said that a spouse’s cause of action for loss of consortium exists in the common law independent of the injured spouse’s right to maintain an action for injuries sustained. (See Millington v Southeastern Elevator Co., 22 NY2d 498, 507-508; Green v Hudson Riv. R. R. Co., 28 Barb 9, supra; Sorensen v Balaban, 11 App Div 164, 165, supra.) In this regard, we adopt the reasoning set forth in Osborn v Kelley (61 AD2d 367, 370, supra) 'that insofar as plaintiff is attempting to recover for loss of consortium for the period prior to decedent’s death, a *302 cause of action is stated. (Hentze v Curry Chevrolet Sales & Servs., 46 AD2d 800.) Such a cause of action, however, is a derivative one (cf. Millington v Southeastern Elevator Co., 22 NY2d 498.) The wrongful death statute created a new cause of action based not upon damage to the estate of the deceased because of death, but rather for the pecuniary injury to the surviving spouse and next of kin of the decedent (Greco v Kresge Co., 277 NY 26, 32). Since a decedent has no cause of action to recover damages for his death (EPTL 11-3.3), plaintiff has no derivative cause of action to recover for loss of consortium due to decedent’s death.’ ” Thus, though the parties have each attempted to calculate the difference between Mrs. Doe’s expected work-life earnings before her contamination with the AIDS virus and after contamination with the AIDS virus, that is not a measure of damage here. Rather, as to her earnings and fringe benefits, she may recover only that loss occasioned by her injury during her expected remaining lifetime. As to the wages she might have earned but for her death, she is not entitled to a recovery under New York legislation or the common law. Rather, under EPTL 5-4.1, her personal representative may later bring an action for the pecuniary loss of her distributees. In this case, relegating Mr. Doe and the children to that later action does not yield an unnecessary duplication of litigation or a waste of judicial resources in that, at her death, there can be little doubt that Mrs. Doe will leave children surviving who will suffer a pecuniary injury upon her death. If, as we have nearly every expectation will be the case, she dies from her HIV infection, her personal representative would be expected to bring a wrongful death cause of action against the State and use the judgment of liability garnered here to establish this course of events against that party. It is wrong to assume that the children will only suffer pecuniary injury arising from the loss of Mrs. Doe’s wages. Rather, they will be entitled to recover for all the pecuniary injuries they suffer as the result of the premature loss of this parent, which also include intellectual, moral and physical training, guidance and assistance she would have given the children had she not suffered from the defendant’s tortious conduct (see generally, PJI 2:320). The children, of course, were not represented in this action and we would expect a wrongful death action to follow in any event.
Thus, we do not adopt either expert’s findings or estimates of Mrs. Doe’s expected wages and fringe benefits after death. Rather, we will make an award to Mrs. Doe for the loss of *303 wages and fringe benefits she will inevitably suffer during her present life as a result of the disabilities she will incur living with AIDS. We note that pursuant to CPLR 5045 (b), these lost earnings will not be terminated in the event of her death should she die prior to November 1996, but they will be paid over to those to whom she owes a “duty of support” at death or her estate.
As to Mr. Doe’s loss of his wife’s services, this too is a derivative damage and is cognizable upon the claim at bar only for the loss of services during the remaining expected joint lives of the claimants. Again, we find that Mrs. Doe will become disabled for a 14-month period starting in November 1996, and that it is this period which defendant must now compensate Mr. Doe for the loss of his wife’s services. [The court then made detailed findings as to the damages owed claimants, deleted for purposes of publication.]
None of these awards are to be construed to prevent the representative of Mrs. Doe’s estate from commencing an action for wrongful death arising from the defendant’s negligence in the future, if so advised. None of these awards are intended to compensate Mrs. Doe’s then-surviving distributees for their pecuniary injuries arising from Mrs. Doe’s death from AIDS, should that eventually occur. The judgment to be entered herein will so provide. The judgment to be entered herein will also provide that it has been finally determined as against this defendant that its negligence resulted in Mrs. Jane Doe becoming infected with the virus which causes AIDS as of August 21, 1988.
This decision shall not be sealed although previous orders concerning confidentiality in this matter are continued. Subject to further order of the court, the court will retain all exhibits herein. Counsel are requested to continue to use their best efforts to preserve the identity of claimants and John Smith.
Because the defendant has not waived the application of CPLR article 50-B, the defendant is entitled to have this judgment structured. Counsel are directed to contact my chambers to arrange for the submission of the additional evidence required to enter a final judgment herein in accordance with CPLR article 50-B.

. Court orders have resulted in the use of assumed names for the claimants and for the subject inmate. As there was an assertion that this inmate had HIV infection, we have gone through extraordinary efforts to observe the confidences preserved by the Legislature under section 2785 of the Public Health Law (see, e.g., Doe v State of New York, 152 Misc 2d 922). At trial, we ordered that the inmate be called "John Smith”. We had marked three exhibits which were, when necessary, shown to witnesses who knew the true names of the claimants and the inmate, to inform them of the substituted names. Thus, the transcript herein, which was made by a certified court reporter prior to electronic recording in the Court of Claims (see, L 1992, ch 55, § 414), does not contain the real names of the parties. The courtroom was open to the media, who attended on each day of the trial. The exhibits, some of which are not redacted, have not been made available for public inspection.

. "For, it is common sense and good law that, when one is confronted with a sudden and unexpected event or combination of events which leave *291 little or no time for reflection or deliberate judgment, this itself may be a significant circumstance which, realistically as well as conceptually, should enter into the determination of the reasonableness of the choice of action pursued (see Rossman v La Grega, 28 NY2d 300; Wagner v International Ry. Co., 232 NY 176” (Ferrer v Harris, 55 NY2d 285, 292-293).

. In his posttrial brief, claimants’ counsel sums up the obligation owed to Mr. Doe only as follows: "The Defendant has conceded a duty to restrain the inmate Smith upon request by Doe and her fellow nurses. That duty extends not only to Doe, but also her husband. The failure on the part of the Defendants [sic] to meet their [sic] duty has put Mr. Doe at risk to develop [sic] and become HIV positive.”

. Dr. Albert Saab testified needle sticks transmitted infection in approximately 3 or 4 times per 1,000, although the likelihood of infection increases in relation to the increasing levels of the source’s infection.

. The risk of contamination is so great that the claimants have had to and will forever have to change the course of their intimate relations or risk Mr. Doe’s death from the disease as well.

. Were Mr. Smith suffering from some other contagion, would claimants assert that the duty owed to Mr. Doe is the same? Clearly, the foreseeable injuries arising from a breach of the obligation to provide appropriate correctional security does not make the State responsible for the spread of contagious diseases to those not in privity with the State. Does the State’s *299 obligation owed change in light of the disease the inmate presents? We think not. The foreseeable risks presented by inmates in outside hospital settings are, with respect to the defendant, the dangers of escape and assault not the risks of contagion. Nevertheless, we recognize that there is increasing recognition that a duty owed to one spouse may result in one owed to the other directly, i.e., where a physician negligently performs a vasectomy, a breach of duty may occur to the patient’s wife, though she was not under the physician’s care (see, e.g., Miller v Rivard, 180 AD2d 331).